## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DANIEL GUTIERREZ**,

       Plaintiff,

  vs.                         **CIV. NO.  02-582 MCA/ACT**

**ALBUQUERQUE POLICE K-9 OFFICER P.E. HACKETT,
ALBUQUERQUE POLICE K-9 SERGEANT THOMAS GARDUNO**,
and the **CITY OF ALBUQUERQUE, NEW MEXICO**,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the following motions:  Defendant P.E. Hackett's ***Motion for Summary Judgment*** [Doc. No. 48] filed on March 28, 2003; ***Plaintiff's Motion and Memorandum for Partial Summary Judgment on Liability on Count I:  Fourth Amendment Use of Excessive Force*** [Doc. No. 51] filed on April 10, 2003; Defendant P.E. Hackett's ***Motion for Separate Trials*** [Doc. No. 57] filed on April 23, 2003; ***Defendants Tom Garduno and City of Albuquerque's Motion for Partial Summary Judgment:  Dismissal of Supervisory Liability Claims (Count Two) and Municipal Liability Claim (Count Three)*** [Doc. No. 59] filed on April 23, 2003; Defendant P.E. Hackett's ***Motion to Strike Plaintiff's Expert Testimony for Non-Disclosure and Violation of Rules 16(f) and 26(a)*** [Doc. No. 66] filed on May 22, 2003; ***Defendant Hackett's Motion to Strike No. II Regarding Expert Testimony Contained in Plaintiff's "Drameeco Kindle"***

*Videotape for Non-Disclosure and Violation of Rules 16(f) and 26(a)* [Doc. No. 70] filed on May 27, 2003; and *Plaintiff's Motion for a Telephonic Re-Scheduling Conference That Will Allow the Scheduling of Liability Expert Reports and Depositions in August and September 2003* [Doc. No. 79] filed on July 25, 2003.  Having reviewed the submissions of the parties, the relevant law, and otherwise being fully advised in the premises, the Court determines that the parties' summary-judgment motions [Doc. No.  48, 51, 59] must be denied because there are genuine issues of material fact concerning Plaintiff's claims of excessive force, municipal liability, and supervisory liability.

The Court further determines that good cause exists for the jury to consider Plaintiff's Fourth Amendment claim against Defendant Hackett in his individual capacity separately from Plaintiff's claims of supervisory liability and municipal liability directed at Defendants Garduno and the City of Albuquerque.  Accordingly, the Court grants Defendant Hackett's motion for separate trials.  [Doc. No. 57.]

Having reviewed the *Magistrate Judge's Proposed Findings and Recommended Disposition* [Doc. No. 82], and Plaintiff's objections thereto [Doc. No. 83], the Court grants Defendant Hackett's motions to strike [Doc. No. 66, 70] in part as to the use of Plaintiff's expert testimony during the trial of Plaintiff's claim against Defendant Hackett.  The Court denies Defendant Hackett's motions to strike in part as to the trial of Plaintiff's claims against Defendants Garduno and the City of Albuquerque.  Plaintiff's motion for a telephonic rescheduling conference [Doc. No. 79] is denied as moot.

## I.    <u>BACKGROUND</u>

On May 22, 2002, Plaintiff Daniel Gutierrez filed his *Complaint* [Doc. No. 1] in this Court against Defendants P.E. Hackett, Tom Garduno, and the City of Albuquerque, New Mexico.  Plaintiff's *Complaint* alleges that, in his capacity as an officer of the Albuquerque Police Department (APD), Defendant Hackett ordered his police service dog to attack Plaintiff in a manner that constituted excessive force in violation of the Fourth Amendment to the United States Constitution.  Plaintiff's *Complaint* further alleges that, in their respective capacities as Defendant Hackett's supervisor and employer, Defendants Garduno and the City of Albuquerque also violated Plaintiff's constitutional rights under theories of supervisory liability and municipal liability under 42 U.S.C. § 1983.

Defendants filed summary judgment motions regarding each of the above claims [Doc. No. 48, 59], and Plaintiff filed a motion for partial summary judgment regarding Defendant Hackett's liability for the use of excessive force alleged in Count I of the *Complaint* [Doc. No. 51.]   In his brief in response to Defendant Hackett's summary-judgment motion, Plaintiff attached the affidavit of a police-dog trainer, Vanness H. Bogardus, as well as a videotape of a dog attack unrelated to this case.  [Doc. No. 52, Ex. 7, 8.]  Defendant Hackett moved to strike these exhibits and preclude Mr. Bogardus from presenting expert testimony at trial because Plaintiff did not disclose Mr. Bogardus's status as an expert witness in this case by the deadlines imposed in the Initial Pre-Trial Report. [Doc. No. 66, 70.]  The motions to strike were referred to a United States Magistrate Judge

for a recommended disposition pursuant to 28 U.S.C. § 636 (b)(1)(B).  [Doc. No. 81.] Defendant Hackett also moved to bifurcate the trial.  [Doc. No. 57.]

The undisputed facts and evidence of record relating to the parties' summary-judgment motions can be summarized as follows.  In the pre-dawn hours of May 28, 1999, Plaintiff entered a parked Plymouth Neon automobile without the owner's permission and reclined on the front-passenger seat.  The owner of the vehicle called the Albuquerque Police Department, and officers were dispatched to the scene to investigate a suspected auto burglary.  Defendant Hackett and Officer Greg Callahan responded to the call.  The officers approached the vehicle and could see Plaintiff "balled up" in the front passenger seat. Officer Callaghan further approached the vehicle and opened the front passenger door immediately adjacent to Plaintiff.  After Plaintiff remained motionless and failed to respond to the officers' actions, Defendant Hackett ordered his police service dog to bite and hold Plaintiff.  (Hackett Aff. ¶¶ 3, 7, 10, 16, 19, 25, 27, 30; Ex. 1, 2, 3 to Pltf.'s Mot.)

The parties disagree as to the circumstances that led to the police dog's attack. According to Defendants, the dog attack occurred only after Plaintiff failed to respond to verbal commands and other actions directed at getting his attention and ordering him to exit the vehicle.  Defendants also claim that the officers at the scene perceived a potential threat to their safety because Plaintiff's hands were concealed, the scene was very dark, and the circumstances led them to believe that Plaintiff was in the process of committing the felony offense of auto burglary.  (Hackett Aff. ¶¶ 9, 11, 13, 14, 20, 21, 22, 23, 24, 25, 29, 31.)

According to Plaintiff, he did not respond to the officer's commands and other actions prior to the dog attack because he had fallen asleep or "passed out" in the vehicle.  In this regard, Plaintiff alleges that he entered the vehicle to rest because he had become too tired and inebriated to continue his walk home from a nightclub at which he had consumed a number of alcoholic beverages.  He further alleges that he did not awaken until the police dog attacked him.  (Ex. 1, 3, 6 to Pltf.'s Mot.)

Photographs taken of Plaintiff after the dog attack show a series of bite marks and cuts on his abdomen and arm. (Ex. 2 to Pltf.'s Mot.)  The parties disagree about the causes of these injuries.  According to Plaintiff, Defendant Hackett ordered the dog to continue biting him even after he awoke, displayed his empty hands, and was incapacitated.  (Ex. 1, 2, 4 to Pltf.'s Mot.)  According to Defendants, any additional injuries inflicted after the initial dog attack were caused by Plaintiff's physical resistance to the dog and his continued failure to obey the officers' commands to exit the vehicle and lie down on the ground.  (Hackett Aff. ¶ 32-38.)

It is undisputed that the City of Albuquerque has standard operating procedures, or "SOPs," regarding the use of force and the use of the Albuquerque Police Department's "K9 Unit."  In support of their summary-judgment motion, Defendants Garduno and the City of Albuquerque cite the following language from an SOP regarding the use of force:

> It is the policy of this department that officers shall use only that force which is reasonably necessary to protect the sanctity of human life, preserve and protect individual liberties, and to effect lawful objectives.  All officers will act in good faith in the exercise of force.  The officers' options can range from a continuum of verbal persuasion to deadly force.

(Ex. B to Defts.' Mem.)  Defendants Garduno and the City of Albuquerque also cite the

following language from an SOP regarding the K9 Unit:

POLICY:

The policy of the Bureau is that the K9 Unit will be utilized to search
buildings for criminal intruders and perform other duties as required.

RULES AND PROCEDURES:

The dogs will be used to detain offenders, protect their handlers, pursue and
detain fleeing criminals, track/wind scent individuals, be effective in crowd
control, detect certain narcotics, and any other function deemed necessary by
the Police Department.  When using police service dogs, handlers will always
consider the severity of the crime(s) involved; any threat to the officer(s) or
others; whether the suspect has actively resisted or is trying to escape and all
other factors set out in the departmental use of force policy.  The use of a
canine is an escalation of force, but is to be considered less force than a baton.
Prior to the use of a canine, the criteria of the use of force is to be evaluated.

(Ex. C to Defts.' Mem.)

In response to Defendants' contentions regarding the SOPs quoted above, Plaintiff has

produced a complete copy of the SOP regarding the K9 Unit.  To support his argument that

this SOP provides grounds for municipal liability, Plaintiff highlights the language quoted

above to the effect that the use of a canine "is to be considered less force than a baton."  (Ex.

1 to Pltf.'s Resp.)    Plaintiff also cites the following provisions from the "operational

procedures" section of the SOP:

If the suspect flees at any point, you will order him to stop and if he continues,
you can use the dog to overtake and detain him.

. . . .

Fleeing criminal suspects may be apprehended by using the dogs. . . .

> Canine units can be used to apprehend persons fleeing or resisting arrest, when there is reason to believe that the subject(s) has committed a felony.

(Ex. 1 to Pltf.'s Resp.)

The SOP regarding the K-9 Unit also explains the training regime and command structure of that unit.  As part of their "aggression training," the dogs are "allowed to bite anywhere on the body."  Further, "[t]he unit supervisor will be responsible for seeing that the proper training is given to each handler and canine. . . .  Officers will follow the training directives of the trainer and Sergeant."  (Ex. 1 to Pltf.'s Resp.)  It is undisputed that "Defendant Garduno was the Albuquerque Police Department Sergeant assigned to train and supervise the K-9 officers including Defendant Hackett and who approved the use of force." (Compl. ¶ 7; Defts.' Answers ¶ 7.)

In addition to the SOPs, Plaintiff has presented evidence that other individuals have suffered serious injuries as a result of attacks by police service dogs under the command of Albuquerque police officers.  Some of these individuals also filed civil actions in this district seeking an award of damages for their injuries.  According to Plaintiff, this evidence shows a municipal policy or custom of using police service dogs to attack and bite unarmed, motionless suspects who do not pose a significant threat to anyone.

Plaintiff also relies heavily on another dog-bite case tried in this district.  See Smith v. City of Albuquerque, No. CIV 01-416 BB/LFG (D.N.M. 2002).  In that case, the Honorable Bruce Black denied the defendants' motions for summary judgment, including a motion for summary judgment on the plaintiff's municipal-liability claim.  [No. CIV 01-

416, Doc. No. 178.]  The trial of the claims against the individual officer in that case resulted

in a verdict for the plaintiff.  [No. CIV 01-416, Doc. No. 260.]  The claims against both the

officer and the City were subsequently dismissed pursuant to a stipulation by the parties.

[No. CIV 01-416, Doc No. 263, 264.]

Finally, Plaintiff has submitted an affidavit of a police-dog trainer, Vanness H.

Bogardus III, and a videotape showing a police dog attack in another case unrelated to this

one.  (Ex. 7, 8 to Pltf.'s Resp.)  As noted above, Defendant Hackett has moved to strike these

exhibits.  [Doc. No. 66, 70.]  The Court does not find it necessary to summarize the contents

of these exhibits because there are disputed issues of material fact which preclude summary

judgment in either side's favor regardless of whether or not these exhibits are considered.

## II.  ANALYSIS

### A.  Summary Judgment Motions

#### 1.  Standard of Review

Summary judgment under Fed. R. Civ. P. 56(c) "shall be rendered forthwith if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "When a

motion for summary judgment is made and supported as provided in this rule, an adverse

party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."

Fed. R. Civ. P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts

showing that there is a genuine issue for trial."  Id.  Judgment is appropriate "as a matter of

law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. In particular, "an expert opinion may not be sufficient to overcome summary judgment 'if it is conclusory and thus fails to raise a genuine issue of material fact.'"  Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001) (quoting Matthiesen v. Banc One Mortgage Corp., 173 F.3d 1242, 1247 (10th Cir. 1999)).

It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendant's unlawful conduct.  See Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001).  If the plaintiff fails to meet this burden, then the Court

must grant the defendant qualified immunity.  See id. at 1156.  If the plaintiff does establish the violation of a clearly-established constitutional or statutory right, then (for purposes of the defendant's summary-judgment motion) the burden shifts to the defendant to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.  See id.

### 2.    Individual Liability and Qualified Immunity

42 U.S.C. § 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Persons sued in their individual capacity under this federal civil-rights statute generally are entitled to qualified immunity unless it is shown that their actions violated a specific statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue.  See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances," particularly when an official's conduct amounts to "obvious cruelty."  Hope

-10-

v. Pelzer, 536 U.S. 730, 741, 745 (2002); see, e.g., Holland v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001) (denying qualified immunity to SWAT deputies "for training a firearm directly on a four-year-old child").  The "salient question" is whether the state of the law at the time of the incident gave the defendants "fair warning" that their conduct was unconstitutional.  Hope, 536 U.S. at 741.

In this case, the constitutional right at issue is the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  In his *Complaint*, Plaintiff contends that Defendant Hackett violated his rights under the Fourth Amendment by using excessive force.

When, as here, a defense of qualified immunity is raised by an individual Defendant in the context of the Fourth Amendment, the Court applies two distinct standards of reasonableness.  First, in determining whether an individual defendant's actions violated a specific right, the Court must decide whether the defendant conducted a search or seizure that was "unreasonable" under the Fourth Amendment.  Second, if such a violation is found, then in determining whether the constitutional right at issue was clearly established at the time of the search or seizure, the Court must answer the additional question of whether the contours of the right were "sufficiently clear that a reasonable official would understand that what he [did] violate[d] that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987); accord Saucier v. Katz, 533 U.S. 194, 203-04 (2001).

The subjective intentions or state of mind of the Plaintiff or the officer are not relevant to determining whether a search or seizure is executed in a manner that is objectively

reasonable under the Fourth Amendment.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001); United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996).  Rather, "the reasonableness of an officer's conduct must be assessed 'from the perspective of a reasonable officer on the scene,' recognizing the fact that the officer may be 'forced to make split-second judgments' under stressful and dangerous conditions."  Medina, 252 F.3d at 1131 (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)).  This assessment must be "based upon the information the officers had when the conduct occurred."  Saucier, 533 U.S. at 207.

Determining whether a seizure is "unreasonable" under the Fourth Amendment generally requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396 (citing Tenn. v. Garner, 471 U.S. 1, 8-9 (1985)); accord Saucier,  533 U.S. at 207.  When deadly force is used, the following factors also are employed to determine the reasonableness of a seizure:  (1) whether "the suspect threatens the officer with a weapon or there is probable cause to believe that he committed a crime involving the infliction or threatened infliction of serious physical harm," (2) whether the officer's use of deadly force is "necessary to prevent escape," and (3) whether "where feasible, some warning has been given."  Garner, 471 U.S. at 11-12.

The Tenth Circuit has not yet specifically addressed the theory that a dog attack constitutes the use of deadly force.  On a more general level, however, the Tenth Circuit has

noted that "the use of deadly force does not occur only when the suspect actually dies." Ryder v. City of Topeka, 814 F.2d 1412, 1416 n.11 (10th Cir. 1987) (citing the definition of deadly force provided in Model Penal Code § 3.11(2) (1985)).  Based on this reasoning, some courts have concluded that a dog attack may constitute the use of deadly force under certain circumstances.  See, e.g., Trujillo v. Bernalillo County, Civ. No. 00-1682 JP/LCS-ACE, slip. op. at 5-6 (D.N.M. Dec. 14, 2001) (unpublished memorandum opinion and order).

The weight of authority from other circuits, however, holds that "bite and hold" attacks by police dogs generally do not constitute the use of deadly force.  See Jarrett v. Town of Yarmouth, 331 F.3d 140, 149 (1st Cir. 2003); Robinette v. Burns, 854 F.2d 909, 912 (6th Cir. 1988); Kuha v. City of Minnetonka, 328 F.3d 427, 434-35 (8th Cir. 2003); Vera Cruz v. City of Escondido, 139 F.3d 659, 663 (9th Cir. 1997).  While these authorities may conflict to some degree with the reasoning in Ryder, 814 F.2d at 1416 n.11, they do support the conclusion that there is no clearly established law that is favorable to Plaintiff on this particular issue.  Given the absence of a reported opinion from the Tenth Circuit that is directly on point, and the weight of authority from other circuits, this Court concludes that the state of the law at the time of the incident did not give Defendant Hackett fair warning that the dog attack constituted the type of deadly force which is subject to the more stringent test for reasonableness articulated in Garner, 471 U.S. at 11-12.  See Hope, 536 U.S. at 741; Saucier, 533 U.S. at 203-04.  Therefore, Plaintiff is not entitled to summary judgment on the

-13-

specific theory that Defendant Hackett's use of a dog to attack him constituted deadly force, because Defendant Hackett would be entitled to qualified immunity on that specific theory.[1]

The Court's conclusion in this regard does not, however, preclude Plaintiff from proceeding to trial on the theory that the dog attack ordered by Defendant Hackett was excessive and unreasonable under the standard applicable to non-deadly uses of force. Plaintiff is not necessarily required to show that he suffered any physical injuries (much less fatal injuries) in order to prevail on a claim of excessive force under 42 U.S.C. § 1983. See Holland, 268 F.3d at 1195. "[T]he interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests--a person's 'sense of security' and individual dignity." Id. Recognition of such interests is "clearly established." Id. at 1197. It follows that a dog attack ordered by a police officer may give rise to a claim of excessive force regardless of the level of bodily harm inflicted by the attack.

Further, a police officer's use of force remains subject to the more generalized test for reasonableness articulated in Graham, 490 U.S. at 396, even when that use of force is considered non-deadly, see, e.g., Saucier, 533 U.S. at 207. Accordingly, the Court employs

---

[1]In reaching the conclusion that Defendant Hackett is entitled to qualified immunity on the deadly-force theory, the Court departs from the approach taken in Smith v. City of Albuquerque, No. CIV 01-416 BB/LFG, slip. op. at 4-5 (D.N.M. Oct. 7, 2002) (unpublished memorandum opinion and order denying motions for summary judgment). In that case, the pretrial motions filed by the parties could be decided without reaching the issue of whether a dog attack constituted deadly force. The Court cannot take that approach here because, unlike Smith, the Plaintiff in this case has moved for summary judgment on his excessive-force claim against Defendant Hackett, and the evidence of record might very well require this Court to grant Plaintiff's motion if Defendant Hackett's conduct were subject to the stricter requirements for the use of deadly force articulated in Garner.

the factors articulated in <u>Graham</u> as the legal standard for assessing the reasonableness of Defendant Hackett's conduct in this instance.  Inasmuch as the factors articulated in <u>Graham</u> are derived from the test previously articulated in <u>Garner</u>, 471 U.S. at 10-11, the <u>Garner</u> factors also may be relevant (though not dispositive) in determining the reasonableness of a non-deadly use of force.

There are disputed issues of material fact which preclude summary judgment under the standard of reasonableness articulated in <u>Graham</u>.  With respect to the severity of the crime, Defendants have presented evidence to support their view that they had reason to suspect Plaintiff of committing the felony offense of auto burglary.  The evidence presented by Plaintiff, on the other hand, suggests that a reasonable investigation might have revealed to the officers that Plaintiff was merely a trespasser who had become confused and passed out in someone else's car as a result of inebriation and exhaustion.

While the evidence of record does not support the view that Plaintiff was sleeping so innocently that the officers had no reason to conduct an investigative detention, the fact that he may have been guilty of some criminal offense does not, in itself, justify the use of excessive force.  The constitutional prohibition on the use of excessive force "serves as a protection to the innocent as well as to the guilty."  <u>Ullmann v. United States</u>, 350 U.S. 422, 427 (1956); <u>see</u> <u>Kopf v. Skyrm</u>, 993 F.2d 374, 379 (4th Cir. 1993).  So long as "probable cause is present, the actual guilt or innocence of the arrestee is irrelevant to the amount of force that may be used."  <u>Kopf</u>, 993 F.2d at 379; <u>cf.</u> <u>Graham</u>, 490 U.S. at 396 (noting that

the reasonableness of a particular use of force is not to be judged "with the 20/20 vision of hindsight").

When considered in the light most favorable to Plaintiff, the evidence of record does not provide Defendants with a reasonable basis for believing that Plaintiff had committed a violent crime that posed a significant threat of bodily harm to anyone at the time of the attack. In this regard, Defendants point to evidence suggesting that they had probable cause to believe that Plaintiff was engaged in an auto burglary. Burglary, however, is considered a property crime rather than a violent crime. As such, it is not an inherently dangerous offense. See Garner, 471 U.S. at 21; Ryder, 814 F.2d at 1420.

There are also disputed issues of material fact with respect to whether Plaintiff posed a danger to the officers or others at the scene, and with respect to the immediacy of that danger. On the one hand, Defendants point to evidence that Plaintiff's hands were concealed in his shirt and that the scene was very dark at the time they were called to investigate the alleged auto burglary. On the other hand, Defendant Hackett admits in his affidavit that Plaintiff "remained motionless" prior to the dog attack. (Hackett Aff. ¶ 14.) There is no evidence that Plaintiff was in the process of fleeing or was in a position to drive off in the vehicle while reclining in the passenger seat. There is also no evidence that Defendant Hackett was forced into a situation where he had to make a "split-second" decision about whether to order his dog to attack.

Defendants have not pointed to any evidence suggesting that Plaintiff was armed or was prone to violence. They point to no evidence that he was holding or moving any object

-16-

in his hands, or that the officers were unable to improve their vision of the scene with the aid of a device such as a flashlight.   In these respects, this case is distinguishable from Ryder, 814 F.2d at 1421, where the officer "had probable cause to believe that the suspect he was chasing down the darkened alley was both armed and prone to violence."

Additionally, there are disputed issues of material fact as to whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight, such that the attack by the police service dog was necessary, or at least related, to the prevention of his escape. Defendants have presented evidence that Plaintiff failed to respond to their commands and may have been attempting to hide in the vehicle.  Plaintiff has presented contrary evidence suggesting that he made no attempt to flee and instead remained motionless.  According to Plaintiff, the reason he did not respond was that he was unconscious, having fallen into a deep sleep, or "passed out," due to inebriation and exhaustion.

While neither Plaintiff's subjective state of mind nor the subjective intentions of the officer are relevant to the Fourth Amendment inquiry, see Sullivan, 532 U.S. at 771-72; Sanchez, 89 F.3d at 718, there is evidence from which a jury could infer that, under an objective standard, a reasonable  officer in this situation would have the ability to safely observe and determine whether Plaintiff was unconscious by other means before the dog was ordered to attack.  In particular, Defendant Hackett admits that the officers could see that Plaintiff "remained motionless," and that Officer Callaghan was able to open the door of the vehicle immediately adjacent to where Plaintiff was reclining before the dog attack.

Finally, there remain factual disputes concerning the reasons why the dog was allowed to continue the attack for such a prolonged period after the first bite was inflicted. According to Defendant, Plaintiff was responsible for prolonging the attack because he resisted the dog and refused to obey the officers' commands. According to Plaintiff, there was no reason to continue the dog attack because he was incapacitated and posed no threat to the officers. Given the presence of these disputed issues, the fact that the officers issued some type of verbal warning before releasing the dog does not provide a basis for granting summary judgment.

If the jury chooses to believe Plaintiff's version of events, then the use of force in this case may come close to the form of sadistic cruelty for which no case law directly on point is needed to defeat the defense of qualified immunity. See Hope, 536 U.S. at 741, 745; Holland, 268 F.3d at 1197. In this regard, the Eleventh Circuit has held that there was clearly established law in 1994 under which it is unreasonable and excessive for a police officer to order and allow his dog to attack and bite an unarmed individual who already submitted to the officer's authority and who posed no threat of bodily harm to the officer or to anyone else. See Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000). Qualified immunity also has been denied to officers accused of using excessive force in dog attacks under similar circumstances. See, e.g., Vathekan v. Prince Georges County, 154 F.3d 173, 179 (4th Cir. 1998) ("Fourth Circuit precedent existing in 1995 clearly established that failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context."); Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998)

("[I]t was clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation."); <u>Mendoza v. Block</u>, 27 F.3d 1357, 1362 (9th Cir. 1994) ("[N]o particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control.").

Under this line of authorities, the Court concludes that Defendant Hackett was given fair warning that it is unreasonable and excessive to order and allow a police service dog to attack and bite an unconscious, motionless, or incapacitated individual when there is no evidence to suggest that the individual is armed, prone to violence, or in flight. Accordingly, the Court concludes that there are disputed issues of material fact with regard to Plaintiff's excessive-force claim against Defendant Hackett, and that Defendant Hackett is not entitled to qualified immunity with respect to this claim insofar as it is based on a theory that the dog attack constituted a non-deadly use of force. For the above reasons, neither Plaintiff nor Defendant Hackett are entitled to summary judgment.[2]

### 3.    Municipal Liability and Supervisory Liability

Defendants Garduno and the City of Albuquerque have jointly moved for summary judgment on Plaintiff's claims of supervisory liability and municipal liability. They contend

---

[2] The Court will not further address the arguments advanced by Defendants Garduno and the City of Albuquerque which are entirely premised on the assertion that Defendant Hackett committed no constitutional violation in this case. Those arguments are foreclosed by the above analysis of Defendant Hackett's summary-judgment motion.

that they are entitled to summary judgment on these claims because Plaintiff has not shown that he was injured by any illegal policy or custom, or by any failure to train or supervise which evinces a deliberate indifference to the rights of the City's inhabitants.  In response to Defendants' motion, Plaintiff asserts that the City of Albuquerque has an illegal policy or custom of using police dogs to attack and bite passive suspects who do not pose a danger to officers or the public.  Plaintiff further asserts that by implementing or ratifying this policy or custom through the training and supervision they provided to Defendant Hackett, Defendants Garduno and the City of Albuquerque caused the violation of Plaintiff's Fourth Amendment rights in this case.

A municipality "may be held liable under 42 U.S.C. § 1983 only for its own unconstitutional or illegal policies and not for the tortious acts of its employees." Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998).  In order to prevail on a claim of municipal liability, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id.  "[W]hen an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." Id.

In the absence of such an explicit policy, proving culpability and causation are more difficult, as plaintiffs are required to show "'deliberate indifference to the rights of persons with whom the police come into contact.'" Olsen v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).  Such

deliberate indifference may be shown "'when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.'"  Id. (quoting Barney, 143 F.3d at 1307).

To establish supervisory liability under 42 U.S.C. § 1983, a plaintiff must demonstrate an affirmative link between the supervisor's conduct and the constitutional deprivation.  See Holland, 268 F.3d at 1187.  In particular, a plaintiff must show that the supervisor actively participated or acquiesced in the constitutional violation through personal participation, an exercise of control or direction, or a failure to supervise.  See id.

In this case, Plaintiff primarily relies on the theories of municipal liability and supervisory liability that were addressed in Smith v. City of Albuquerque, CIV. No. 01-416 BB/LFG (D.N.M. Oct. 8, 2002) (unpublished memorandum opinion and order denying motions for summary judgment).  These theories can be divided into two categories.  The first category involves the implementation or ratification of a municipal policy regarding the use of police dogs which is itself excessive and unconstitutional.  The second category involves the employer or supervisor's deliberate indifference to the fact that their police dogs routinely fail to obey the commands or training given to them, as when a dog consistently attacks and bites suspects upon completion of a search despite being trained or instructed to "guard and bark" under these circumstances.  See id., slip. op. at 9-12.

Plaintiff's claims in this case do not fall under the second category of theories addressed in Smith, CIV No. 01-416 BB/LFG, supra.  Plaintiff has not presented evidence

which can support a reasonable inference that the alleged constitutional violation was caused by Defendants' deliberate indifference to the police dog's failure to obey training or commands with respect to a "guard and bark" policy.  The dog used in this case was never instructed to "guard and bark" at Plaintiff.  Rather, Defendant Hackett admits in his affidavit that the dog complied with a specific order to "bite and hold" Plaintiff after one of the officers opened the door to the vehicle in which Plaintiff was located.  (Hackett Aff. ¶¶ 10, 19, 30.)

For these reasons, Plaintiff's claims of municipal liability and supervisory liability in this case are limited to the first category of theories addressed in Smith, CIV No. 01-416 BB/LFG, supra.  As in Smith, Plaintiff alleges that the City's standard operating procedures (SOPs) regarding the use of police service dogs are themselves unconstitutional, and that the implementation or ratification of those procedures by Defendants Hackett and Garduno caused the constitutional violation alleged here.

There is no question that the policy stated in the SOPs is attributable to the City.  See Anaya v. Crossroads Managed Care Systems, Inc., 195 F.3d 584, 592-93 (10th Cir. 1999). Plaintiff also has presented evidence that the policy stated in the SOPs is implemented through the training and supervision provided to Defendant Hackett by his supervisor and employer.  The SOP for the K-9 Unit itself specifically provides for such training and supervision. (Ex. 1 to Pltf.'s Resp.)  Defendants Garduno and the City of Albuquerque admit in their answers to Plaintiff's *Complaint* that Defendant Garduno "was the Albuquerque Police Department Sergeant assigned to train and supervise the K-9 officers including

Defendant Hackett and who approved the use of force." (Compl. ¶ 7; Defts.' Answers ¶ 7.) In addition, Plaintiff points to Defendant Garduno's deposition testimony in another case where he concurred in the use of a police dog to attack an allegedly motionless suspect who was sleeping in an apartment building. Defendant Garduno stated in his deposition testimony that the use of a police dog in that case was in accordance with City policy. (Garduno Dep. at 5.)

For these reasons, the Court determines that Plaintiff has met his burden of presenting evidence that the policy stated in the SOPs is attributable to the City and that there is a causal link between that policy and Defendant Hackett's use of a police service dog to attack Plaintiff on May 28, 1999. See id.; Kuha, 328 F.3d at 440; Kerr v. City of W. Palm Beach, 875 F.2d 1546, 1557 (11th Cir. 1989). The Court also determines that Plaintiff has met his burden of showing an affirmative link between Defendant Garduno's conduct and the constitutional deprivation alleged here. See Holland, 268 F.3d at 1187.

The parties dispute whether the written policy reflected in the City's SOPs is unconstitutional. In support of their argument that this policy does not violate the Constitution, Defendants point to general language at the beginning of the SOPs regarding "use of force" and the "K9 Unit." This general language appears to follow the test of objective reasonableness articulated in Graham, 490 U.S. at 396. (Ex. B, C to Defts.' Mem.) There is also authority from other circuits which suggests that a policy of using police service dogs to "bite and hold" suspects (as opposed "guard and bark") is not unconstitutional *per se*. See, e.g., Jarrett, 331 F.3d at 150.

-23-

As noted above, the constitutional violation alleged here did not arise from the simple fact that the City's policy authorizes a "bite and hold" technique instead of a "guard and bark" technique.  Rather, the alleged constitutional violation stems from the City's policy regarding the particular conditions under which officers are authorized to use the "bite and hold" technique to detain a suspect.

Plaintiff points to specific language in the "operational procedures" section of the SOP regarding the "K9 Unit" which indicates that dog attacks "are considered less force than a baton" and that police service dogs "can be used to apprehend persons fleeing or resisting arrest, when there is reason to believe that the subject(s) has committed a felony."  (Ex. 1 to Pltf.'s Resp.)  According to Plaintiff, these "operational procedures" instruct officers that they can use a police service dog to "bite and hold" any person who is suspected of committing a felony and who flees or resists arrest.  Plaintiff asserts that such instructions are contrary to the Fourth Amendment because they permit and encourage officers to order dog attacks regardless of the degree of resistance that the suspect exhibits, and regardless of whether the suspect poses any danger to an officer or anyone else.  In particular, Plaintiff asserts that these instructions permit and encourage officers to use their dogs to attack suspects who exhibit nothing more than passive noncompliance with the officer's commands and who pose no significant threat of bodily harm to the officers or other persons.  To support these assertions, Plaintiff points to other cases in which Albuquerque police officers have used dogs to attack passive suspects.  See, e.g., Smith, No. CIV 01-416 BB/LFG, supra.

The Court determines that there are genuine issues of material fact which preclude summary judgment on this theory of municipal liability and supervisory liability.  As noted in Smith, No. CIV 01-416, slip. op. at 9-10, the City's SOP does contain language which suggests a blanket authorization to use police service dogs to bite and hold felony suspects whenever the suspect is "fleeing," regardless of the severity of the crime or the degree of the threat that the suspect poses to officers or others.  The evidence of record viewed in the light most favorable to Plaintiff also supports a reasonable inference that the City's SOP authorizes the use of police service dogs to bite and hold felony suspects whenever the suspect is "resisting arrest," regardless of the nature or cause of such resistance.  Thus, as alleged in this case, the City's SOP might be viewed as authorizing the use of a police service dog to bite and hold a suspect whose "resistance" consists of remaining motionless in response to the officer's commands, and whose motionless, unresponsive state is caused by the fact that he or she is unconscious or too incapacitated to understand or respond to the officer's commands or the dog's behavior.

The SOP's comparison between the use of a police service dog and the use of a baton corroborates this view of the evidence.  It is reasonable to infer that the use of a baton is generally limited to circumstances where it is safe for an officer to approach within a few feet of a suspect, i.e., where the suspect can be reached with an outstretched baton and does not pose a significant danger to the officer at this distance.  By stating that the use of a police service dog is "to be considered less force than a baton," the City's SOP may imply that officers are authorized to order dog attacks even when it is safe for the officer to approach

within a baton's length of the suspect, and when the suspect does not pose a significant danger to the officer at this distance.

Taken in conjunction with the "operational procedures" that authorize officers to order dog attacks whenever a felony suspect flees or resists arrest, a jury could reasonably infer from this language that it is the City's policy to use police service dogs to bite and hold felony suspects even when their "resistance" is entirely passive and may be caused by the fact that they are unconscious or incapacitated.  Deliberately implementing or ratifying such a policy could very well meet the requirements for establishing municipal or supervisory liability under 42 U.S.C. § 1983 in this context.  See Smith, No. CIV 01-416 BB/LFG, supra; cf. Kuha, 328 F.3d at 440 (citing Chew v. Gates, 27 F.3d 1432, 1444-45 (9th Cir. 1994)); Kerr, 875 F.2d at 1557.  Accordingly, the motion for summary judgment filed by Defendants Garduno and the City of Albuquerque with respect to Plaintiff's claims of municipal liability and supervisory liability under 42 U.S.C. § 1983 must be denied.

### B.   Motion for Separate Trials

As the Court has denied the parties' summary judgment motions, it is necessary to address Defendant Hackett's *Motion for Separate Trials*.  [Doc. No. 57.]  In his motion, Defendant Hackett requests that the trial of this matter be bifurcated so that Plaintiff's Fourth Amendment claim against him in his individual capacity is heard separately from Plaintiff's claims of supervisory liability and municipal liability against Defendants Garduno and the City of Albuquerque under 42 U.S.C. § 1983.

This Court "has considerable discretion in determining how a trial is to be conducted." Angelo v. Armstrong World Indus., Inc., 11 F.3d 957, 964 (10th Cir. 1993). As a general rule, the Court has the authority to bifurcate a trial "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Fed. R. Civ. P. 42(b). More specifically, there is ample authority for bifurcating the trial of municipal liability claims from the trial of claims against a police officer in his individual capacity under 42 U.S.C. § 1983. See, e.g., Amato v. City of Saratoga Springs, 170 F.3d 311, 316 (2d Cir. 1999); Brunson v. Dayton, 163 F. Supp. 2d 919, 924-26 (S.D. Ohio 2001); Myatt v. City of Chicago, 816 F. Supp. 1259, 1264 (N.D. Ill. 1992); Marryshow v. Town of Bladensburg, 139 F.R.D. 318, 319 (D. Md. 1991).

In this case, the Court determines that bifurcation of the trial in the manner described above is conducive to expedition and economy insofar as the jury's verdict during the first phase of the trial may obviate or limit the need for certain issues to be tried in the second phase. Bifurcation of the trial also may avoid the unfair prejudice that could result if the broader range of evidence that may be admitted in support of Plaintiff's claims of supervisory liability and municipal liability is considered at the same time as the more limited evidence which is admissible to prove Plaintiff's Fourth Amendment claim against Defendant Hackett in his individual capacity.

For these reasons, Defendant Hackett's *Motion for Separate Trials* is granted. The first phase of the trial will be limited to Plaintiff's Fourth Amendment claim against Defendant Hackett in his individual capacity. The second phase of the trial, if necessary,

will proceed before the same jury as soon as practicable after completion of the first phase and will encompass Plaintiff's claims of supervisory liability and municipal liability against Defendants Garduno and the City of Albuquerque.

### C.    Motions to Strike Expert Testimony and Videotape

The Court next addresses Defendant Hackett's motions to preclude Plaintiff's police-dog expert, Vanness H. Bogardus III, from testifying at trial, and to strike Mr. Bogardus's affidavit as well as the videotape marked as Plaintiff's Exhibit 8.  [Doc. No. 66, 70.]  These motions were referred to United States Magistrate Judge Torgerson for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  The Court has conducted a de novo review of those portions of Judge Torgerson's *Proposed Findings and Recommended Disposition* to which Plaintiff objected.  Based upon this review, the Court determines that  Plaintiff's objections to the findings of fact proposed by Judge Torgerson are without merit, and those proposed findings are hereby adopted as the findings of the Court.

The Court further determines that these findings of fact amply support the conclusions of law proposed by Judge Torgerson, with the exception of Proposed Conclusions of Law Number 3, 7, 8, and 9, which are modified and supplemented as set forth below.  The Court's modifications follow from the fact that, at the time Judge Torgerson made his proposed conclusions of law, he did not have the benefit of the Court's rulings on Defendant Hackett's *Motion for Separate Trials* or the parties' summary-judgment motions.

Under the analysis provided in Section II.A. of this *Memorandum Opinion and Order*, the Court's decision about whether to grant or deny the parties' summary-judgment motions

does not rest on the evidence provided in Mr. Bogardus' affidavit or the "Drameeco Kindle" videotape marked as Plaintiff's Exhibit 8. Regardless of whether the affidavit and videotape are considered or stricken, the Court would still deny the parties' summary-judgment motions. Accordingly, for purposes of ruling on the summary-judgment motions, Defendant Hackett's motions to strike these items are denied as moot. Proposed Conclusions of Law Number 7 and 9, as well as the Recommended Disposition, are modified to reflect that this issue is now moot.

The Court's decision to bifurcate the trial of this matter, as explained in Section II.B of this *Memorandum Opinion and Order*, affects the degree of prejudice that may result if Plaintiff's expert witness, Mr. Bogardus, is allowed to testify, or precluded from testifying, at trial. The Court agrees with the proposed conclusion that Defendant Hackett would be unfairly prejudiced if Mr. Bogardus were allowed to testify during the first phase of the trial regarding Plaintiff's Fourth Amendment claim against Defendant Hackett in his individual capacity. The Court also concludes that the prejudice to Plaintiff that may result if Mr. Bogardus is precluded from testifying during this phase of the trial is not significant because the proposed expert testimony is of questionable relevance and admissibility if offered to prove Defendant Hackett's individual liability under the Fourth Amendment in this context. See Medina, 252 F.3d at 1133; Romero v. Bd. of County Comm'rs., 60 F.3d 702, 705 (10th Cir. 1995); Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995), abrogated on other grounds by Saucier, 533 U.S. at 194; Marquez v. City of Albuquerque, Civ. No. 01-445 WWD/LFG, slip. op. at 2-3 (D.N.M. Sept. 24, 2002). Accordingly, an appropriate sanction

for Plaintiff's failure to comply with the deadlines established pursuant to Fed. R. Civ. P. 26(a)(2)(B) is to preclude the testimony of Plaintiff's expert, Mr. Bogardus, during the first phase of the trial regarding his Fourth Amendment claim against Defendant Hackett in his individual capacity.  Defendant Hackett's motion to strike Mr. Bogardus's testimony is granted in part with respect to Mr. Bogardus's testimony during the first phase of the trial.

The Court reaches a different conclusion with respect to Plaintiff's right to offer Mr. Bogardus's expert testimony during the second phase of the trial regarding the claims of supervisory liability and municipal liability against Defendants Garduno and the City of Albuquerque.  To preclude such testimony from the second phase of the trial would be an extremely severe sanction insofar as expert testimony by a police-procedures expert may be admissible and of central relevance in proving claims of municipal liability or supervisory liability in this context.  See Wilson, 52 F.3d at 1554 (citing Zuchel v. City and County of Denver, 997 F.2d 730, 742 (10th Cir. 1993), for the proposition that expert testimony on police procedures may be relevant and admissible to show a municipality's "derivative liability in training officers").  Further, Defendants Garduno and the City of Albuquerque are in less of a position to complain that they are unfairly prejudiced by such testimony in this case because Mr. Bogardus's testimony already is of record in a previous case tried in November 2002, in which an almost identical claim of municipal liability arising from the same dog-bite policy was raised against the City.  See Smith, CIV No. 01-416 BB/LFG, supra.  In addition, Defendants Garduno and the City of Albuquerque did not join in Defendant Hackett's motions to strike or timely file similar motions of their own.

For these reasons, Proposed Conclusions of Law Number 3 and 8, as well as the Recommended Disposition, are modified so as not to preclude Plaintiff from offering the expert testimony of Mr. Bogardus during the second phase of the trial regarding Plaintiff's claims of supervisory liability and municipal liability against Defendants Garduno and the City of Albuquerque.  Defendant Hackett's motion to strike Mr. Bogardus's testimony is denied in part with respect to Mr. Bogardus's testimony during the second phase of the trial.

Finally, none of the Court's rulings on Defendant Hackett's motions to strike are intended to preclude the United States District Judge who presides over any phase of the trial of this matter from ruling on motions in limine or objections that may pertain to the admissibility of Mr. Bogardus' testimony or the "Drameeco Kindle" videotape under the Federal Rules of Evidence.  The scope of this Court's rulings on Defendant Hackett's motions to strike is limited to the grounds set forth therein, namely failure to comply with Fed. R. Civ. P. 16(f) and 26(a).

## III.   <u>CONCLUSION</u>

For the foregoing reasons, genuine issues of material fact preclude the Court from granting any of the parties' motions for summary judgment.  The trial of this matter will be bifurcated in order to separate the claim against Defendant Hackett in his individual capacity from the claims of supervisory liability and municipal liability against Defendants Garduno and the City of Albuquerque.  Due to his failure to comply with the established deadlines for filing expert reports pursuant to Fed. R. Civ. P. 26(a)(2)(B), Plaintiff will be precluded from

offering the expert testimony of Vanness Bogardus III during the first phase of the trial regarding his Fourth Amendment claim against Defendant Hackett in his individual capacity.

**IT IS, THEREFORE, ORDERED** that Defendant P.E. Hackett's ***Motion for Summary Judgment*** [Doc. No. 48] is **DENIED**.

**IT IS FURTHER ORDERED** that ***Plaintiff's Motion and Memorandum for Partial Summary Judgment on Liability on Count I:  Fourth Amendment Use of Excessive Force*** [Doc. No. 51] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant P.E. Hackett's ***Motion for Separate Trials*** [Doc. No. 57] is **GRANTED** under the conditions specified herein.

**IT IS FURTHER ORDERED** that ***Defendants Tom Garduno and City of Albuquerque's Motion for Partial Summary Judgment: Dismissal of Supervisory Liability Claims (Count Two) and Municipal Liability Claim (Count Three)*** [Doc. No. 59] is **DENIED**.

**IT IS FURTHER ORDERED** that the ***Magistrate Judge's Proposed Findings and Recommended Disposition*** [Doc. No. 82] are **ADOPTED** with the modifications specified herein.

**IT IS FURTHER ORDERED** that Defendant P.E. Hackett's ***Motion to Strike Plaintiff's Expert Testimony for Non-Disclosure and Violation of Rules 16(f) and 26(a)*** [Doc. No. 66] is **GRANTED IN PART** and **DENIED IN PART** under the conditions specified herein.

**IT IS FURTHER ORDERED** that *Defendant Hackett's Motion to Strike No. II Regarding Expert Testimony Contained in Plaintiff's "Drameeco Kindle" Videotape for Non-Disclosure and Violation of Rules 16(f) and 26(a)* [Doc. No. 70] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that *Plaintiff's Motion for a Telephonic Re-Scheduling Conference That Will Allow the Scheduling of Liability Expert Reports and Depositions in August and September 2003* [Doc. No. 79] is **DENIED AS MOOT**.

**SO ORDERED**, this 18th day of September 2003, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
*United States District Judge*

-33-